IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EMMANUEL F. STOCKER and | : | CIVIL ACTION |
| LEONETTE STOCKER | : | |
| | : | |
| v. | : | |
| | : | |
| GREEN, TWEED & CO., INC. | : | NO.  18-4503 |

## MEMORANDUM

**Padova, J.**                                                          July 31, 2020

Plaintiffs have brought this employment discrimination action against Emmanuel Stocker's ("Stocker") former employer, Green, Tweed & Co. ("GTC").  Stocker asserts claims against GTC pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 1210 et seq.; the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq.; and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. Ann. § 951 et seq.  Plaintiff Leonette Stocker ("Mrs. Stocker") asserts a state law loss of consortium claim against GTC.  GTC has filed a Motion for Summary Judgment seeking summary judgment as to all counts of the Complaint.  For the reasons that follow, we grant the Motion in part and deny it in part.

## I.      FACTUAL BACKGROUND

Stocker is an African American man who was employed by GTC from 2000 until his employment was terminated by GTC on March 7, 2017.  (Concise Statement of Stipulated Material Facts ("SF") ¶¶ 1, 12-13.)  At the time of his termination, Stocker worked as a production machinist for GTC.  (Id. ¶ 12.)  Stocker was represented by a union while he worked at GTC.  (Id. ¶ 14.)

George Landes became Stocker's direct supervisor in January 2016 and was his direct supervisor at the time of his termination.  (Id. ¶ 15.)  David Brooks was Stocker's direct supervisor prior to January 2016.  (Id. ¶ 16.)  Aaron Holmes, who is African American, is a vice president of the union to which Stocker belonged at GTC.  (Id. ¶¶ 19-20.)  Holmes is employed at GTC as a CNC machinist.  (Id. ¶ 19.)

Stocker was approved for, and took, short term disability/FMLA leave from June 6, 2016 through October 31, 2016.  (Id. ¶ 42.)  Liberty Mutual administers GTC's leave and short-term disability programs.  (Id. ¶ 43.)  Stocker and/or his doctors communicated with Liberty Mutual about his applications for short-term disability and/or medical leave.  (Id. ¶ 44.)

Stocker was disciplined several times over the years while he was employed at GTC.  He was disciplined for failure to follow work instructions in 2003; for careless operation of a machine in 2007; for failure to meet production and/or quality standards in 2013; and for attendance violations between 2010-15.  (Id. ¶¶ 23-29.)  After Landes became Stocker's supervisor in January 2016, Stocker was disciplined with increasing frequency, leading to his termination in March 2017. He was disciplined seven times during that period:

- Stocker was issued a first level written warning on April 7, 2016, after he was observed by GTC supervisors Dan Boulay and David Brooks to be asleep on a chair inside the work area on April 6, 2016.  (Id. ¶ 30.)

- On November 9, 2016, Stocker was issued a written/verbal warning after he was observed by Landes using his cellphone in a work area on May 31, 2016.  The discipline was delayed because Stocker was on leave from June 6, 2016 through October 31, 2016.  (Id. ¶¶ 31, 42.)

- On November 9, 2016, Stocker was issued a "Level Two with 3-day suspension" discipline for using foul or abusive language to George Landes on May 31, 2016. (Id. ¶ 32.) Stocker was accused of yelling "'get out of my f-ing toolbox; get out of my f-ing stuff'" at Landes in response to Landes's actions regarding his cellphone on that date. (Id.) The discipline was delayed due to Stocker's leave. (Id.) The union filed a grievance regarding this discipline. (Id. ¶ 32.a.) GTC subsequently reduced the penalty to a one-day suspension and gave Stocker two days of pay for the other two days he had been suspended. (Id.)

- On November 9, 2016, Stocker was issued a "Level One" discipline for being inside of a yellow-lined safe work area on October 31, 2016 "without the required safety glasses and safety shoes, which was a safety violation." (Id. ¶ 33.) Before the discipline was issued, Landes told Stocker that he was violating the safety policy and needed to exit the safe work area to put on his personal protective equipment. (Id.) Stocker, however, stayed inside the safe work area while he put on his safety shoes. (Id.) When the Level One discipline for this incident was combined with the Level One discipline issued on April 7, 2016, it became a "Level Two violation and a one-day suspension." (Id.)

- On December 21, 2016, Stocker was issued a written/verbal discipline for failing to report to his workstation at the beginning of his shift, even though he clocked-in at his start time of 6:45 a.m. (Id. ¶ 34.) He was found in a restroom and then went to HR. (Id.) Stocker left GTC for the day at 11:00 a.m. (Id.)

- On March 7, 2017, Stocker was issued two disciplines for loitering, i.e., being present in his work area without actively working, on February 28, 2017 and March 1, 2017. (Id. ¶¶ 35-36.) On both days, Landes observed Stocker in his work area, but "his machines were not running and Mr. Stocker was not actively engaged in any work." (Id.)

3

Pursuant to its progressive discipline policy, GTC combined the written/verbal warning for February 28, 2017 with the written/verbal warnings on May 31, 2016 and December 9, 2016 to make a Level One offense.  It combined this Level One offense with the April 7, 2016 Level One offense to make a Level Two offense with a one-day suspension.  (Id. ¶ 37.)  Under GTC's policy, three one-day suspensions within a 12-month period are cause for termination.  (Id. ¶ 38.)  The verbal warning for March 1, 2017 could also have led to the same penalty as the written/verbal warning for February 28, 2017.  (Id. ¶ 39.)  GTC terminated Stocker's employment on March 7, 2017.  (Id. ¶ 41.)

Stocker filed a grievance over his termination and pursued the grievance through binding arbitration.  (Id. ¶ 45.)  On April 17, 2017, Stocker was offered a "Last Chance Agreement" that would rescind his termination, but he chose not to accept it.  (Id. ¶ 46.)  The arbitrator concluded that GTC had "demonstrated that the discharge of the grievant, Emmanuel Stocker, was for just cause" and denied Stocker's grievance.  (Arb. Decision at 12 (Docket No. 35 at 201 of 214).)

Stocker filed a Charge of Discrimination with the EEOC on December 27, 2017.  (SF ¶ 47.)  In his Charge, Stocker alleged that he had been discriminated against on the basis of his race and disability and that he had been retaliated against.  (Id.)

The Complaint asserts claims on behalf of Stocker for race discrimination in violation of Title VII (Count I); disability discrimination in violation of the ADA (Count II); retaliation in violation of Title VII and the ADA (Count III); retaliation in violation of the FMLA (Count IV); and discrimination and retaliation in violation of the PHRA (Count V).  The Complaint also asserts a claim of loss of consortium on behalf of Leonette Stocker (Count VI).  Plaintiffs seek compensatory damages, punitive damages, attorneys' fees and costs, front pay, back pay, and interest for Stocker and compensatory damages for Leonette Stocker.

4

II.     **LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the nonmoving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court" that "there is an absence of evidence to support the nonmoving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response "must support the assertion [that a fact is genuinely disputed] by:  (A) citing to particular parts of materials in the record . . .; or (B) showing that the materials [that the moving party has] cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1).  Summary judgment is appropriate if the nonmoving party fails to respond with a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.  In ruling on a summary judgment motion, we consider "the facts and draw all reasonable inferences in the light most favorable to . . . the party who oppose[s] summary judgment." Lamont v. New Jersey, 637 F.3d 177, 179 n.1 (3d Cir. 2011) (citing Scott v. Harris, 550 U.S. 372, 378 (2007)).

### III.    DISCUSSION

A.    <u>Statute of Limitations</u>

GTC argues that all of Stocker's claims that he was discriminated and retaliated against are time barred under Title VII, the ADA and the PHRA, except for his Title VII and ADA claims relating to his termination.  Title VII and the ADA provide that the maximum limitations period for filing a charge of discrimination is "three hundred days after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e); 42 U.S.C. § 12117(a).  However, the limitations period for filing a claim under the PHRA is 180 days.  <u>See</u> 43 Pa. Stat. Ann. § 959(h) ("Any complaint filed pursuant to this section must be so filed within one hundred eighty days after the alleged act of discrimination, unless otherwise required by the Fair Housing Act.").

1.    <u>Title VII and ADA discrimination claims</u>

Stocker filed a Charge of Discrimination against GTC with the EEOC on December 27, 2017.  (SF ¶ 47.)  GTC argues that, as a result, he can pursue a timely claim of discrimination only with respect to discrete acts that occurred on or after March 2, 2017, which was 300 days prior to the date on which he filed his Charge of Discrimination.  The Supreme Court has explained that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."  <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 113 (2002).  "Each discrete discriminatory act starts a new clock for filing charges alleging that act.  The charge, therefore, must be filed within the 180– or 300–day time period after the discrete discriminatory act occurred."  <u>Id.</u>  The Supreme Court also noted that "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify.  Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"  <u>Id.</u> at 114.  The United States Court of Appeals for the Third Circuit has

6

concluded that <u>Morgan</u> applies to all federal employment law claims, not just to Title VII claims. <u>See</u> <u>O'Connor v. City of Newark</u>, 440 F.3d 125, 128 (3d Cir. 2006) ("We find persuasive the reasoning of our sister circuits that the distinction between 'continuing violations' and 'discrete acts' is not an artifact of Title VII, but is rather a generic feature of federal employment law."). The only discreet act of discrimination alleged in the Complaint that occurred on or after March 2, 2017, was Stocker's termination.

Plaintiffs contend that we should not use December 27, 2017 as Stocker's EEOC filing date to determine what discreet discriminatory acts may be included in his discrimination claims. Rather, they maintain that we should count back the 300-day limitations period from August 31, 2017. Stocker visited the EEOC on August 31, 2017 with the intention of filing a Charge of Discrimination against GTC. (Stocker Dep. at 25-26.) While he was there, Stocker filled out an intake questionnaire and a "Decision Not to File" form, on which he checked the box next to the following statement: "I have decided not to file at this time because I need additional time to obtain information in support of my charge and/or because I require additional time to determine whether I want to pursue this matter further by filing a charge . . . ." (<u>Id.</u> at 24-25.) Stocker explained at his deposition that he had planned to file a Charge of Discrimination against GTC on August 31, 2017, but did not do so because he needed additional paperwork. (<u>Id.</u> at 25-26.) The EEOC investigator wrote in the EEOC Charge Detail Inquiry on August 31, 2017 that Stocker said that he "needs more time to compile evidence" and that he had set up a telephone interview for the following week. (Cabrera Ex. A at 3 of 4.)

The Supreme Court has held that the "time period for filing a charge is subject to equitable doctrines such as tolling or estoppel." <u>Morgan</u>, 536 U.S. at 113 (citation omitted). Plaintiffs argue that we should toll the statute of limitations in this case because Stocker intended to file his Charge

of Discrimination when he went to the EEOC on August 31, 2017.  They rely on Huggler v. Elkins

Stroud Suplee & Co., 505 F. Supp. 9 (E.D. Pa. 1980), which states that "when an individual makes

a good faith effort to comply with the administrative process by filing charges with the EEOC and

relies on the special expertise of the EEOC to implement proper procedures, including deferral to

the proper state agency, he should not be barred from suit."  Id. at 11-12 (quoting McAdams v.

Thermal Industries, Inc., 428 F. Supp. 156, 161 (W.D. Pa. 1977)).  However, Huggler did not

involve an individual who went to the EEOC and specifically declined to file a charge of

discrimination.  Rather, the issue in Huggler was whether a complaint should be dismissed because

it did not specifically allege that the plaintiff had exhausted her state and local remedies prior to

filing suit.  Id. at 10.  Because the plaintiff had filed a charge of discrimination with the EEOC,

which is supposed to transmit claims to the appropriate state agency, the district court declined to

dismiss her suit.  Id. at 11-12.  Instead, the district court allowed the plaintiff to "amend her

complaint to allege specifically whether the EEOC, acting on her behalf, invoked or exhausted

available state administrative remedies."  Id. at 12.

　　Plaintiffs also rely on Lowenstein v. Catholic Health East, 820 F. Supp. 2d 639 (E.D. Pa.

2011), which states that "[t]he purpose of the exhaustion requirement is satisfied as long as 'the

EEOC had cognizance of the full scope of the situation during its settlement efforts.'"  Id. at 645

(quoting Anjelino v. N.Y. Times Co., 200 F.3d 73, 94 (3d Cir. 1999)).  However, this case also

does not support Plaintiffs' argument.  Lowenstein concerns the scope of a private civil action filed

after the plaintiff filed a charge of discrimination with the EEOC and after the EEOC had

conducted its investigation and issued a right to sue letter.  Id. at 644 ("'Once a charge of some

sort is filed with the EEOC, . . . the scope of a resulting private civil action in the district court is

defined by the scope of the EEOC investigation which can reasonably be expected to grow out of

the charge of discrimination . . . .'" (alterations in original) (quoting Hicks v. ABT Assocs., Inc., 572 F.2d 960, 966 (3d Cir. 1978)).  Lowenstein does not concern a situation like the instant proceeding in which no charge was filed.  Plaintiffs do not point to any authority that directly supports their argument that the statute of limitations should be calculated based on the date that Stocker first visited the EEOC.  Accordingly, we conclude that the 300-day limitations period for Stocker's employment discrimination claims brought pursuant to Title VII and the ADA should be calculated from December 27, 2017, the date on which Stocker filed his Charge of Discrimination against GTC.  See 42 U.S.C. § 2000e-5(e); 42 U.S.C. § 12117(a).  Therefore, we further conclude that to the extent that Stocker's Title VII and ADA discrimination claims in Counts I and II rely on discrete discriminatory acts that occurred prior to March 2, 2017, they are barred by the applicable statutes of limitations.  Consequently, we grant the Motion for Summary Judgment as to Stocker's claims for discrimination under Title VII and the ADA in Counts I and II to the extent that those claims are based on discrete discriminatory acts that occurred prior to March 2, 2017, which leaves Stocker's termination as the only discrete act subject to his Title VII and ADA discrimination claims.

### 2.   Title VII and ADA hostile work environment claims

Plaintiffs also argue that Stocker's Title VII and ADA hostile work environment claims allege continuing violations that are not barred by the applicable statutes of limitations.  The Supreme Court has held that a hostile work environment exists where "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65, 67 (1986)).  The Supreme Court recognized in Morgan that hostile work

9

environment claims should be treated differently with respect to the running of the statute of limitations than discrimination claims based on discreet discriminatory acts. "Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The 'unlawful employment practice' therefore cannot be said to occur on any particular day." Morgan, 536 U.S. at 115 (citations omitted). As the Supreme Court explained, a hostile work environment "occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." Id. (citation omitted.) "[T]he 'hostile workplace environment' theory is designed explicitly to address situations in which the plaintiff's claim is based on the cumulative effect of a thousand cuts, rather than on any particular action taken by the defendant." O'Connor, 440 F.3d at 128. "In such cases, obviously the filing clock cannot begin running with the first act, because at that point the plaintiff has no claim; nor can a claim expire as to that first act, because the full course of conduct is the actionable infringement." Id. (citing Morgan, 536 U.S. at 117-18). Thus, "[u]nder the continuing violation doctrine, discriminatory acts that are not individually actionable may be aggregated to make out a hostile work environment claim; such acts 'can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period.'" Mandel v. M & Q Packaging Corp., 706 F.3d 157, 165 (3d Cir. 2013) (quoting O'Connor, 440 F.3d at 127). To establish "a continuing violation, the plaintiff must show that all acts which constitute the claim are part of the same unlawful employment practice and that at least one act falls within the applicable limitations period." Id. at 165-66 (citing Morgan, 536 U.S. at 122; West v. Phila. Elec. Co., 45 F.3d 744, 754-55 (3d Cir. 1995)).

Plaintiffs contend that Landes subjected Stocker to a hostile work environment from the time he became Stocker's supervisor until Stocker was terminated on March 7, 2017, including,

but not limited to, the disciplines that Landes imposed on Stocker between April 7, 2016 and March 7, 2017.  (See SF ¶¶ 30-35.)  Since Stocker was disciplined by Landes and terminated within the limitations periods for Title VII and ADA claims, we conclude that Stocker's Title VII and ADA hostile work environment claims in Counts I and II are not barred by the applicable statutes of limitations.  Accordingly, we deny the Motion for Summary Judgment to the extent that Defendants argue that Stocker's Title VII and ADA hostile work environment claims in Counts I and II are barred by the applicable statutes of limitations.[1]

        3.   <u>PHRA claims</u>

As we discussed above, the statute of limitations for filing a claim under the PHRA is 180 days.  <u>See</u> 43 Pa. Stat. Ann. § 959(h).  None of the actions on which Stocker bases his discrimination and hostile work environment claims occurred within 180 days of the date Stocker filed his Charge of Discrimination against GTC.  Accordingly, we conclude that Stocker's PHRA discrimination and retaliation claims in Count V are barred by the PHRA's statute of limitations, and we grant the Motion for Summary Judgment as to this argument.

      B.   <u>Race Discrimination in Violation of Title VII</u>

        1.   <u>The prima facie case</u>

GTC also argues that it is entitled to summary judgment as to Stocker's race discrimination claim in Count I because Stocker is unable to establish a prima facie case of discrimination under the burden shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-

---

[1] GTC also argues that we should dismiss Plaintiffs' title VII and ADA retaliation claims (Count III) because they are barred by the statute of limitations.  However, we grant the Motion for Summary Judgment as to these claims on other grounds in Section E, infra, and thus decline to address GTC's argument with respect to the statute of limitations.

04 (1973).[2]  "The <u>McDonnell Douglas</u> framework requires that the plaintiff first establish a *prima facie* case of discrimination or retaliation."  <u>Tourtellotte v. Eli Lilly & Co.</u>, 636 F. App'x 831, 842 (3d Cir. 2016).  "If the plaintiff successfully meets the requirements of a *prima facie* case, the burden then shifts to the employer to articulate a legitimate, nonretaliatory or nondiscriminatory reason for its actions."  <u>Id.</u>  "If the employer produces such a reason, the burden then shifts back to the plaintiff to prove that the employer's nonretaliatory or nondiscriminatory explanation is merely a pretext for the discrimination or retaliation.  <u>Id.</u> (citing <u>McDonnell Douglas</u>, 411 U.S. at 802-04; <u>Atkinson v. LaFayette Coll.</u>, 460 F.3d 447, 454 (3d Cir. 2006)).  "In the context of a challenge to a grant of summary judgment, at the pretext stage of <u>McDonnell Douglas</u> the [plaintiff] 'must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'"  <u>Id.</u> (quoting <u>Tomasso v. Boeing Co.</u>, 445 F.3d 702, 706 (3d Cir. 2006)).  "To accomplish this, the appellant must 'demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] nondiscriminatory reasons.'"  <u>Id.</u> (alteration in original) (quoting <u>Tomasso</u>, 445 F.3d at 706).

In order to establish a prima facie case of discrimination a plaintiff must demonstrate the following:  "(1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for a

---

[2] In the absence of direct evidence of discrimination, Title VII discrimination claims are analyzed under the burden-shifting framework established by <u>McDonnell Douglas</u>.  See <u>Kant v. Seton Hall Univ.</u>, 289 F. App'x 564, 566 (3d Cir. 2008) (citations omitted).

position or was performing said position satisfactorily; (3) the plaintiff suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of unlawful discrimination." Massaro v. Wells Fargo Home Mortg., Civ. A. No. 16-4899, 2018 WL 4076319, at *3 (E.D. Pa. Aug. 24, 2018) (citing Fekade v. Lincoln Univ., 167 F. Supp. 2d 731, 742 (E.D. Pa. 2001)). GTC argues that, while Stocker belongs to a protected class and suffered the adverse action of termination, his termination did not occur under circumstances that give rise to an inference of unlawful discrimination.

### 2. Circumstances that give rise to an inference of discrimination

GTC argues that Stocker cannot establish a prima facie case of discrimination because there is no record evidence that would show that his termination was motivated by his race. A plaintiff "must produce 'evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion." Leftwich v. Lew, Civ. A. No. 15-300, 2015 WL 8773274, at *7 (E.D. Pa. Dec. 14, 2015), aff'd sub nom. Leftwich v. Sec'y United States Dep't of the Treasury, 741 F. App'x 879 (3d Cir. 2018) (quoting Kier v. F. Lackland & Sons, LLC, 72 F. Supp. 3d 597, 608-09 (E.D. Pa. 2014)). "The 'central focus' of the *prima facie* case 'is always whether the employer is treating some people less favorably than others because of their race . . . .'" Id. (quoting Sarullo v. U.S. Postal Serv., 352 F.3d 789, 798 (3d Cir. 2003)). A plaintiff "can support an inference of discrimination 'in a number of ways, including, but not limited to, comparator evidence, evidence of similar racial discrimination of other employees, or direct evidence of discrimination from statements or actions by her supervisors suggesting racial animus.'" Id. (quoting Golod v. Bank of Amer. Corp., 403 F. App'x 699, 702 n.2 (3d Cir. 2010)). "[A] plaintiff can create an inference of discrimination . . . by offering evidence of a similarly situated employee, not of the protected class, who was treated more favorably" than the plaintiff.

13

Viscomi v. Corizon Corr. Healthcare, Civ. A. No. 14-5759, 2015 WL 4770589, at *3 (E.D. Pa. Aug. 12, 2015) (citing Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 645 (3d Cir. 1998)).

Stocker was terminated in accordance with GTC's progressive discipline policy after he accumulated three one-day suspensions within a 12-month period.  (SF ¶ 38.)  Those one-day suspensions were (1) the Level Two with 3-day suspension issued on November 9, 2016 for using foul or abusive language on May 31, 2016, which was later reduced to a one-day suspension after Stocker's union filed a grievance on his behalf (id. ¶¶ 32-32.a); (2) the Level One discipline issued on November 9, 2016 for failing to wear safety equipment inside the safe work area on October 31, 2016, which was combined with the Level One discipline issued on April 7, 2016 for sleeping in a work area to become a Level Two violation and a one-day suspension (id. ¶¶ 30, 33); and (3) the discipline for loitering issued on March 7, 2017 for being present in the work area but not actually working on February 28, 2017, which was combined with the written/verbal warnings on May 31, 2016 (for using a cellphone in a work area) and December 9, 2016 (for failing to report to his work area after clocking in) to become a Level One discipline and was also combined with the Level One discipline issued on April 7, 2016 to become a Level Two violation with a one day suspension (id. ¶¶ 30-31, 34, 35, 37-38, 41).[3]

Plaintiffs maintain that all of these disciplinary actions, which GTC combined to trigger his termination, "occurred under circumstances that give rise to an inference of unlawful

_____

[3] GTC does not explain, how, under its progressive discipline policy, Stocker's Level One discipline for sleeping in a work area on April 6, 2016 could be combined with both his November 9, 2016 Level One discipline for failing to wear his safety equipment inside the safe work area on October 31, 2016 to become a Level Two discipline with a one-day suspension and could also be combined with the three verbal warnings for actions taken on May 31, 2016, December 9, 2016, and February 28, 2017, to result in a second Level Two discipline.

discrimination." <u>Massaro</u>, 2018 WL 4076319, at *3 (citing <u>Fekade</u>, 167 F. Supp. 2d at 742).
Plaintiffs first point to evidence that Stocker was the only African-American employee on his side
of the building during his shift.  (Stocker Dep. at 42.)  In addition, Stocker's union representative,
Holmes, testified at his deposition that he has known Stocker for 18 or 19 years and that Stocker
had a reputation among his co-workers of doing decent work.  (Holmes Dep. at 12-13, 30.)
According to Holmes, "Manny has always been known for being a stickler for producing good
work [and] he took the added steps to ensure that what he was making was going to be good." (<u>Id.</u>
at 91.)

Plaintiffs also rely on Holmes's deposition testimony to show that Landes disciplined
Stocker for actions that would not result in discipline by most of GTC's supervisors.  One example
was Landes's discipline of Stocker for not wearing his safety equipment in a work area.  Holmes
explained that Stocker returned to work from his short-term disability leave on October 31, 2016.
(<u>Id.</u> at 43.)  While Stocker was on leave, GTC changed the area where the employees' lockers and
toolboxes were kept to an area inside the restricted work area, "[s]o, if Manny needed to get his
shoes, he would have had to cross the line."  (<u>Id.</u> at 43-44.)  Landes followed Stocker "through the
hallway to see where he was going to stop . . .  to put on his safety shoes."  (<u>Id.</u> at 21.)  However,
the "the line for where you have to have [safety shoes] on is a very blurred line.  It's not really
clear.  And most supervisors, you know, as long as you're not engaged in work, don't really care
about that type of thing."  (<u>Id.</u>)  "But for some reason, that particular day George [Landes] was
really riding him."  (<u>Id.</u>)  Landes gave Stocker "a Level 1 write-up for not having his safety shoes
on in a designated area."  (<u>Id.</u> at 22.)  However, as Holmes further described, Stocker was treated
differently from other GTC employees in this instance because, while "15 percent of the
workforce" walked into the department without their safety equipment, most supervisors weren't

sticklers about it, they just wanted their employees to be wearing their safety equipment in their work area, in front of their machines.  (Id. at 119.)

Holmes also testified that Stocker was treated differently than other employees regarding the written warning he received on April 7, 2016, after he was observed by GTC supervisors Dan Boulay and David Brooks to be asleep on a chair inside the work area.  (SF ¶ 30.)  Holmes testified that Stocker "was on his break time.  And it's always a gray area of what you can do on your break time.  So you know, in our opinion, he was on his break time.  He was off the shop floor.  It used to be you could do stuff like that . . . ."  (Holmes Dep. at 33-34.)

Plaintiffs also maintain that there is record evidence that other employees, who are not African American, were not disciplined for having cellphones out on the shop floor.  As we mentioned earlier, on November 9, 2016, Landes issued Stocker a written/verbal warning for having a cellphone out on top of his toolbox on the shop floor on May 31, 2016.  (SF ¶ 31; Holmes Dep. at 36-37.)  Holmes testified that, while having a cellphone out on the shop floor is against GTC's rules, it is not uncommon, and he believes that it occurs about 30% of the time.  (Holmes Dep. at 39.)  Holmes has observed Landes see a worker whose cellphone was out and tell the worker to "put it away" or just ignore it, "[i]t all depends on who you are."  (Id. at 40.)

Plaintiffs also point to evidence that non-African American employees were not disciplined for loitering.  Holmes testified that he had never known of anyone being written up for loitering when that individual was in his own work area and working.  (Id. at 86-87.)  Holmes testified that, during the ten years he has "been doing union stuff," loitering "was reserved for if you're in a different department where you shouldn't be, you know, like hanging out kind of.  That was like the general interpretation."  (Id. at 87.)  Plaintiffs also point to record evidence that Stocker was working at his machine on the days he was disciplined for loitering, trying to fix a problem with

16

his machine and that Landes disciplined Stocker even though he was aware that Stocker was

working on fixing a problem with his machine.  Holmes explained what happened as follows:

> [H]e was having some trouble with an insert.  I believe he sought some attention
> from a chargehand, and they were working through some problems, you know, on
> a Prototrac.  And, yes, he was working through some problems.  He finally did get
> it.  Then he got confused about the type of part . . . .

(Id. at 91.)  Moreover, Landes disciplined Stocker even though Stocker had bought the problem to

Landes's attention earlier in the day.  Holmes recounted that he had prepared a grievance regarding

this discipline and took it to Landes in Landes's office.  (Id. at 93.)  Landes responded "'[g]rievance

denied.  I observed Manny at his machine.  He didn't appear to be doing anything that I would

deem work.'"  (Id.)  During a meeting with Landes and the union after he was terminated, Stocker

said that he had gone to Landes and told him that he was "working through this problem" and that

was "why the productivity numbers are not going to be high."  (Id. at 95.)  Landes admitted that

Stocker had told him that he was having a problem with his machine.  (Id.)

We find that Plaintiffs have pointed to record evidence that Stocker was the only African

American employee of GTC that worked on his side of the building during his shift and that Landes

disciplined Stocker in circumstances in which non-African American employees were often not

disciplined, i.e., for sleeping in the work area during a break, having a cellphone out in the work

area, and loitering in the employee's own work area.  We conclude, accordingly, that Plaintiffs

have satisfied their summary judgment burden by pointing to record evidence that raises a genuine

issue of material fact as to whether Stocker was treated differently than other employees not in his

protected group and, therefore, that "the adverse employment action[s] occurred under

circumstances that give rise to an inference of unlawful discrimination."  Massaro, 2018 WL

4076319, at *3 (citation omitted).  We further conclude, accordingly, that Plaintiffs have

demonstrated the existence of a genuine issue of material fact regarding whether Stocker has established a prima facie case of race discrimination in violation of Title VII, and we deny the Motion for Summary Judgment as to this issue.

        3.   <u>Pretext</u>

GTC also argues that it is entitled to summary judgment as to Stocker's race discrimination claim even if Plaintiffs can establish a prima facie case of discrimination in violation of Title VII, because Plaintiffs cannot satisfy their burden of proving that its legitimate, nondiscriminatory reason for terminating Stocker's employment was pretextual. <u>See</u> <u>Tourtellotte</u>, 636 F. App'x at 842 (citations omitted). GTC maintains that it fired Stocker because it believed that he had committed the disciplinary offenses recorded by Landes and its progressive disciplinary policy required termination after Stocker's loitering incidents. (<u>See</u> Landes Decl. ¶¶ 53, 63-64.) GTC maintains that Landes observed Stocker standing at his machines, doing nothing, during the morning and afternoon of February 28, 2017, that Stocker's machines were not running, and that Stocker was not actively engaged in work. (<u>Id.</u> ¶ 53.) Landes asserts that he went to Stocker on February 28, 2017 and asked what he was doing and that Stocker ignored his question. (<u>Id.</u>) When Landes issued Stocker the written/verbal discipline for loitering on February 28, 2017, Stocker already had more than two written/verbal disciplines in a six-month period. (<u>Id.</u> ¶ 63.) GTC's disciplinary process raised the discipline to a Level One warning, which, combined with Stocker's Level One warning on April 2, 2016, became a Level Two warning with a one-day suspension. (<u>Id.</u>) This was Stocker's third one-day suspension in a twelve-month period. (<u>Id.</u>) Under GTC's rules, three one-day suspensions in a twelve-month period warranted termination. (<u>Id.</u> ¶ 64.) GTC also states that its productivity reports support Landes's observations of Stocker because they show that Stocker produced fewer than 200 pieces on February 28 and March 1, 2017 combined, and

that the employee who worked on the same machine during the next shift made 1700 pieces of the same part during one eight-hour shift.[4]  (Id. ¶¶ 54-57.)

In order to survive a motion for summary judgment where the defendant has satisfied its burden of articulating "legitimate, non-discriminatory reasons for its action," a plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).  The Third Circuit has explained that:

> because the factfinder may infer from the combination of the plaintiff's prima facie case and its own rejection of the employer's proffered non-discriminatory reasons that the employer unlawfully discriminated against the plaintiff and was merely trying to conceal its illegal act with the articulated reasons, a plaintiff who has made out a prima facie case may defeat a motion for summary judgment by *either* (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."

Id. (citation omitted).  "Thus, if the plaintiff has pointed to evidence sufficient[] to discredit the defendant's proffered reasons, to survive summary judgment the plaintiff need not also come

---

[4] GTC also argues that Stocker cannot show that its reason for firing him was pretext because he challenged the decision to terminate him in arbitration and lost.  GTC maintains that it had the burden of showing that it had good cause for Stocker's termination during that proceeding and that it met its burden.  (Stocker Dep. Ex. 41 (the arbitrator's decision).)  The arbitrator concluded, "[a]fter a review of all the evidence, . . . that the grievant chose not to work for a good part of his shifts on February 28 and March 1, 2017, supporting a finding of loitering.  Given he was on the last step of discipline the infraction provides just cause for his discharge."  (Stocker Dep. Ex. 41 at 11.)  However, GTC has cited to no authority that would support the proposition that the decision of the arbitrator could have collateral estoppel effect in this proceeding.  Accordingly, we decline to find that Stocker cannot establish pretext in this proceeding because he did not prevail in his arbitration.

forward with additional evidence of discrimination beyond his or her prima facie case."   Id. (citations omitted).

In addition to Plaintiffs' evidence regarding the loitering incidents, which they rely on in connection with Stocker's prima facie case of discrimination, Plaintiffs also point to the following additional evidence to discredit Landes's stated reasons for imposing the disciplinary actions on Stocker that eventually led to his termination under GTC's progressive discipline process. Plaintiffs first address Landes's discipline of Stoker for using profanity during their May 31, 2016 exchange regarding Stocker's cellphone.   Plaintiffs contend that there is evidence that Landes fabricated his story about Stocker using profanity when he told Stocker to put away his cellphone. Landes issued Stocker a "Level Two with 3-day suspension" discipline for using foul or abusive language towards him on May 31, 2016."   (SF ¶ 32.)   As we described above, Landes claims that Stocker yelled the following:   "get out of my f-ing toolbox; get out of my f-ing stuff."   (Id.) Plaintiffs maintain that this could not have happened because Stocker never uses profanity.   (See Stocker Dep. at 154.)   Holmes confirmed that he has never heard Stocker curse inside or outside of work.   (Holmes Dep. at 37.)   Holmes further testified that he has never heard Stocker say "f--king something" and he would not believe that Stocker would say such a thing.   (Id. at 125-26.) Holmes explained that Stocker "doesn't engage in language of that sort."   (Id. at 126.)   Holmes believes that Stocker does not use that language because of his upbringing, his father is a preacher, and because Stocker is "a man of God, and that's not Godly."   (Id.)

We conclude, based on the evidence discussed above, and the evidence discussed in connection with Plaintiffs' prima facie case, that Plaintiffs have pointed to record evidence "from which a factfinder could reasonably . . . disbelieve [GTC's] articulated legitimate reasons" for Stocker's termination.   See Fuentes, 32 F.3d at 764.   We further conclude, accordingly, that

Plaintiffs have shown that there are genuine issues of material fact regarding whether they have established a prima facie case of discrimination with respect to Stocker's Title VII discrimination claim and whether GTC's legitimate, nondiscriminatory reason for Stocker's termination is pretext.  Consequently, we deny GTC's Motion for Summary Judgment as to Stocker's Title VII discrimination claim related to his termination in Count I.

      C.      <u>Hostile Work Environment Under Title VII</u>

      GTC argues that it is entitled to summary judgment as to Stocker's claim that he was subjected to a hostile work environment in violation of Title VII in Count I because Stocker cannot establish the elements of a hostile work environment claim.  To establish a prima facie case of employment discrimination due to a hostile work environment, a plaintiff must demonstrate the following five elements:  (1) he suffered intentional discrimination because of his race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected him; (4) the discrimination would have detrimentally affected a reasonable person of the same race in his position; and (5) there is a basis for employer liability.  <u>Aman v. Cort Furniture Rental Corp.</u>, 85 F.3d 1074, 1081 (3d Cir. 1996) (citations omitted).  Discrimination is severe or pervasive if it "'alter[s] the conditions of [the victim's] employment and create[s] an abusive working environment.'"  <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 786 (1998) (second alteration in original) (quoting <u>Meritor Savings Bank, FSB v. Vinson</u>, 477 U.S. 57, 67 (1986)).  "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'"  <u>Id.</u> at 788 (quoting <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 80 (1998).  "The hostility of a work environment must be determined by the totality of the circumstances."  <u>Fichter v. AMG Res. Corp.</u>, 528 F. App'x 225, 230 (3d Cir. 2013) (citing <u>Harris v. Forklift Sys.</u>, 510 U.S. 17, 23 (1993)).  "Such circumstances may include 'the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Id. (citing Harris, 510 U.S. at 23).

GTC argues that it is entitled to summary judgment because Plaintiffs have no evidence that Stocker was subjected to severe or pervasive discriminatory conduct on the part of Landes and because Plaintiffs have no evidence that Landes was motivated by race.  GTC relies on Fichter, which states that "[t]o survive summary judgment, [plaintiff] must present 'sufficient evidence to give rise to an inference of discrimination by offering proof that h[is] workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [plaintiff's] employment and create an abusive working environment,' . . . and the conduct [was] based on [plaintiff's protected characteristic]."  Id. at 230-31 (fourth, fifth, and seventh alterations in original) (quoting Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 278-79 (3d Cir. 2001)).  The Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment, and the Courts of Appeals have heeded this view."  Faragher, 524 U.S. at 788 (citations omitted).

Plaintiffs argue that there is record evidence that Landes's harassment of Stocker was severe and pervasive, interfered with his work, and was motivated by his race.  Once again, Plaintiffs rely on Holmes's deposition testimony regarding the manner in which Landes treated Stocker.  Holmes testified that there was a confrontation between Landes and Stocker at the beginning of every shift.  (Holmes Dep. at 24.)  Holmes explained that Landes "would zero in on [Stocker] as soon as he walked in the door, and it seemed like it would just be like 'wow.'"  (Id. at 24-25.)  Holmes observed heated exchanges between Landes and Stocker at least twice a week, but did not see heated exchanges between Landes and any other employee with that frequency.

(Id. at 25.)  Holmes also notes that Landes used a tone with Stocker that he deemed "trying to cause a confrontation" and stated that Landes did not use that tone with others.  (Id. at 25-26.) Holmes also testified that Landes's approach to Stocker was "accusatory as soon as [he] walk[ed] in the door."  (Id. at 26.)  Holmes further stressed that Landes's treatment of Stocker was different from his treatment of other employees:

> It seemed like, you know, it was a witch-hunt on the company's part by Mr. Landes and the company to kind of get him out of there.  They zeroed in on him on several occasions.  I never seen anybody be zeroed in on like that before.  I've been there a long time.
>
> It seemed like they were going out of their way to find things to write him up on where I know for a fact that some people, other people are doing some of these other things and not being written up.

(Id. at 118-19.)  Holmes also testified regarding the severity of Landes's harassment of Stocker and the manner in which it interfered with his work.  The union filed a grievance regarding Landes's issuance of a discipline to Stocker for not being in his work area in early December 2016 because "the company wasn't providing a safe work environment" for Stocker.  (Id. at 74.)  Holmes explained that there was clearly a serious dispute between Stocker and Landes "and the company wasn't taking what the union felt was proper steps to kind of resolve the issue.  George [Landes] was still there.  He would still be the first person Manny saw when he came into the building, and that . . . was causing problems for Manny."  (Id. at 74-75.)

Holmes further stated that, while other people complained about Landes, those "incidents were not frequent."  (Id. at 75.)  However, with Stocker:

> [t]his was like a daily interaction between the two of them that was just out of control. . . .  It seemed like George was following him, you know, his every move. If he went to the bathroom, get up out of his office . . . .  And, you know, we come in one day and all of a sudden the machine that [Stocker] works on is put directly in front of George's office.  Like there's a window right there.  We asked George, "What's this about?"  You know what I mean?  "Why did you move the machine?"

> He said, "Oh, we just decided to move the department around." You know, it kind
> of gave the impression that he wanted to keep a close tab on what Manny was
> exactly doing. Whenever he didn't see Manny in his line of sight, he would get up
> and go find him.

(Id. at 76.) Holmes personally observed Landes follow Stocker around the work area. He testified

that he "would walk back by the time clock and I would see Manny leave to go measure a part,

and I would see George get up and go follow in that direction and then come back to the area,

come back to his office." (Id. at 77.) "George would get up out of his office[,] out of his chair,

walk around the corner, do a look and come back." (Id. at 78.) Holmes observed Landes leave

his office to follow Stocker at least three or four times. (Id.)

Holmes also testified as to the effect that Landes's actions had on Stocker. The parties

stipulated that on December 21, 2016, Stocker was issued a written/verbal discipline for failing to

report to his work station at the beginning of his shift on December 16, 2016, even though he had

clocked-in on time. (SF ¶ 34.) Holmes explained that Stocker had had an argument with Landes

the day before and had complained to Angela Debro, who was in upper management at GTC, and

asked to be moved to a different area because the confrontations with Landes were causing him

anxiety. (Holmes Dep. at 56.) Stocker saw Holmes that morning and told Holmes that he could

no longer work with Landes. (Id. at 58.) While Holmes and Stocker were looking for someone to

talk to about moving Stocker to a different area, they encountered Landes. (Id. at 58-59.) Stocker

told Landes that they could not work together because it was affecting his blood pressure. (Id. at

60.) On another occasion, Stocker told Holmes that he wanted to have someone else present when

he had to speak with Landes because every time he spoke to Landes he got into an agitated state,

once to the point where he had to have medical attention. (Id. at 66-67.) Holmes recalled one

incident where there was a communication between Landes and Stocker at the beginning of the

shift and Stocker went to the medical office with tears in his eyes saying "'I can't take this anymore.'" (Id. at 68.)  Landes followed Stocker and stopped to tell Holmes that he had a conversation with Stocker and Stocker became upset. (Id. at 69.)  Holmes then checked on Stocker who was being treated in the medical room. (Id.)  Five or ten minutes later an ambulance arrived and took Stocker, who was unresponsive, out on a stretcher. (Id. at 70-71.)  Stocker was taken to the hospital and released later the same day. (Id. at 71.)

We conclude that Plaintiffs have pointed to record evidence that Landes's harassment of Stocker was severe and pervasive, that it detrimentally affected Stocker, and that Stocker brought this harassment to the attention of GTC.  While this testimony does not directly show that Landes's conduct was based on Stocker's race, it does demonstrate that Landes did not treat any other employee in the same severe manner.  Since Stocker was the only African American employee on his shift on that side of the building, this testimony is evidence that Landes did not treat other employees, who were not African American, in the same manner in which he treated Stocker.  We further conclude, accordingly, that Plaintiffs have satisfied their burden at summary judgment of pointing to record evidence that demonstrates the existence of a genuine issue of material fact regarding whether Landes created a hostile work environment.  We therefore deny the Motion for Summary Judgment as to Stocker's claim that he was subjected to a hostile work environment in violation of Title VII in Count I of the Complaint.

D.    Disability Discrimination Under the ADA

GTC argues that it is entitled to summary judgment as to Stocker's disability discrimination claim under the ADA (Count II) because Stocker is unable to establish a prima facie case of discrimination.  "In assessing claims of discrimination on the basis of a disability, courts apply the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-803,

(1973)."  <u>Sampson v. Methacton Sch. Dist.</u>, 88 F. Supp. 3d 422, 434 (E.D. Pa. 2015).  In order to establish a prima facie case of discrimination in violation of the ADA, a plaintiff must show the following:  "(1) that he is disabled within the meaning of the ADA, (2) that he is otherwise qualified for the job, with or without reasonable accommodations, and (3) that he was subjected to an adverse employment decision as a result of discrimination."  <u>Sulima v. Tobyhanna Army Depot</u>, 602 F.3d 177, 185 (3d Cir. 2010) (citing <u>Taylor v. Phoenixville Sch. Dist.</u>, 184 F.3d 296, 306 (3d Cir. 1999)).  "An individual is disabled if he has 'a physical or mental impairment that substantially limits one or more of the major life activities of such individual.'"  <u>Id.</u> (quoting 42 U.S.C. § 12102(2)).  "[T]o establish discrimination because of a disability, an employer must know of the disability."  <u>Rinehimer v. Cemcolift, Inc.</u>, 292 F.3d 375, 380 (3d Cir. 2002) (citing <u>Taylor</u>, 184 F.3d at 313).  GTC contends that Stocker cannot establish a prima facie case of discrimination in violation of the ADA because he cannot show that he is a qualified individual with a disability or that he was subjected to an adverse employment decision as a result of discrimination.

1. <u>Disability</u>

GTC argues that Stocker has not submitted evidence that he is disabled as defined by the ADA.  As stated above, the ADA defines disability "with respect to an individual" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))."  42 U.S.C. § 12102(1).  The ADA defines "major life activities" as including "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2).

Stocker testified at his deposition that he is disabled by stress-related high blood pressure, depression, and an anxiety disorder.  (Stocker Dep. at 28-29.)  GTC asserts that Plaintiffs cannot establish that Stocker's high blood pressure, anxiety and depression are disabilities as defined by the ADA because there is no evidence that these conditions substantially limited one or more of Stocker's major life activities.   Plaintiffs have submitted records from Stocker's treating psychologist, Dr. Dennis Given, who diagnosed him with major depressive disorder and chronic post-traumatic stress disorder, "which undermin[ed] his ability to function" and stated that Stocker should have taken a leave of absence from work until he was more stable.  (Docket No. 35 at 207-09 of 214.)  Plaintiffs have also provided progress notes from Dr. Given dated February 15, 2015, June 26, 2015, August 14, 2015, September 23, 2015, June 27, 2016, and October 13, 2016.  (Id. at 209-14 of 214.)  In addition, Stocker testified at his deposition that his high blood pressure affects his ability to sleep and eat because it causes headaches, and that his anxiety disorder causes him to shop excessively, eat excessively and have bad dreams.  (Stocker Dep. at 32-33.)  Stocker also testified that his high blood pressure prevented him from working on certain days that it was raised as a result of his interactions with Landes.  (Id. at 30-31.)  We conclude that Plaintiffs have pointed to record evidence that supports their contention that Stocker was disabled within the meaning of the ADA by his depression and have also submitted some evidence that Stoker was impaired by his anxiety and high blood pressure.  Accordingly, we further conclude that Plaintiffs have satisfied their summary judgment burden of demonstrating a genuine issue of material fact regarding whether Stocker was disabled as that term is defined by the ADA, and we deny the Motion for Summary Judgement as to this argument.

27

2.   Adverse employment action

GTC argues that it is entitled to summary judgment as to Stocker's ADA claim because there is no evidence that he suffered an adverse employment action as a result of his disability. ADA plaintiffs "must prove that they were treated differently based on the protected characteristic, namely the existence of their disability." CG v. Pennsylvania Dep't of Educ., 734 F.3d 229, 236 (3d Cir. 2013).  "This requires a showing that the disability 'played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process.'" Moore v. CVS Rx Servs., Inc., 142 F. Supp. 3d 321, 346 (M.D. Pa. 2015), aff'd, 660 F. App'x 149 (3d Cir. 2016) (quoting New Directions Treatment Servs. v. City of Reading, 490 F.3d 293, 301 n.4 (3d Cir. 2007)).  As we mentioned above, in order to establish that he was discriminated against on the basis of his disabilities, Stocker must show that GTC knew about his disabilities.  See Rinehimer, 292 F.3d at 380.

GTC maintains that Stocker cannot establish that it had knowledge of his disabilities. Holmes testified that he was present when Stocker told Landes he could not work with Landes because their working relationship was affecting his blood pressure.  (Holmes Dep. at 60.)  In addition, Stocker testified at his deposition that his doctor notified someone with GTC's HR about his high blood pressure in connection with his application for short-term disability leave.  (Id. at 37-38.)  Stocker also testified that he told Angela Debro about his medical issues[5] and that he told Sharon from HR, whose last name he does not recall, that he had problems with anxiety the day after he went to the hospital.  (Stocker Dep. at 39, 41.)

---

[5] Debro denies that Stocker told her that he has high blood pressure.  (Debro Decl. ¶ 30.)

We conclude that there is record evidence that Stocker notified three individuals employed by GTC, including Landes, about his high blood pressure and anxiety.  However, Plaintiffs do not point to any evidence on the record that would show that Landes's treatment of Stocker was motivated by Stocker's medical and mental health conditions.  Therefore, we further conclude that Plaintiffs have failed to demonstrate the existence of a genuine issue of material fact regarding whether Landes treated Stocker differently based on the existence of his high blood pressure, anxiety or depression.  See CG, 734 F.3d at 236.  Accordingly, we grant GTC's Motion for Summary Judgment as to Plaintiffs' claim in Count II that Stocker was discriminated against on the basis of his disability in violation of the ADA.

3.  Reasonable accommodation

GTC also argues that it is entitled to summary judgment as to Stocker's claims for violation of the ADA based on a failure to accommodate theory.  Plaintiffs allege that GTC violated the ADA by denying his psychologist's request for "a reasonable accommodation on [Stocker's] behalf in the form of transferring [him] to the supervision of a different supervisor other than Landes." (Compl. ¶¶ 108-09.)  To succeed on a failure to accommodate claim, a Plaintiff must establish the following four elements:  "(1) he was disabled and his employer knew it; (2) he requested an accommodation or assistance; (3) his employer did not make a good faith effort to assist; and (4) he could have been reasonably accommodated." Garner v. SEPTA, 410 F. Supp. 3d 723, 741 (E.D. Pa 2019) (citing Capps v. Mondelez Global, LLC, 847 F.3d 144, 157 (3d Cir. 2017)); see also Tourtellotte, 636 F. App'x at 849 (citations omitted).

GTC contends that Plaintiffs cannot establish the fourth element of a failure to accommodate claim because replacement of an employee's supervisor is not a reasonable accommodation as a matter of law.  GTC relies on the EEOC's Enforcement Guidance:

Reasonable Accommodation and Undue Hardship Under the Americans With Disabilities Act, 2002 WL 31994335 ("EEOC Guidance") at *24 ("An employer does not have to provide an employee with a new supervisor as a reasonable accommodation.").  GTC also relies on Ozlek v. Potter, 259 F. App'x 417 (3d Cir. 2007), in which the Third Circuit agreed that "the Rehabilitation Act does not require employers to accommodate employees by transfer to another supervisor."  Id. at 420 (quotation omitted); see also Gaul v. Lucent Techs., Inc., 134 F.3d 576, 579 (3d Cir. 1998) (concluding that the plaintiff's "request to be transferred away from individuals causing him prolonged and inordinate stress was unreasonable as a matter of law").  Plaintiffs have not come forward with any authority to support their argument that moving Stocker to another supervisor would have been a reasonable accommodation.  In the absence of such authority, we conclude that Plaintiffs have failed to establish that Stocker "could have been reasonably accommodated." Garner, 410 F. Supp. 3d at 741 (citation omitted).  Accordingly, we further conclude that Plaintiffs cannot establish the four elements of an ADA failure to accommodate claim, and we grant GTC's Motion for Summary Judgment as to Stocker's claim that GTC failed to accommodate his disability in violation of the ADA in Count II of the Complaint.

E.     Retaliation

GTC argues that it is entitled to summary judgment with respect to Stocker's claims of retaliation under Title VII, the ADA, and the FMLA (Counts III and V) because he cannot prove a prima facie case of retaliation and, even if he could, he cannot establish pretext.  Under the McDonnell Douglas framework, a plaintiff asserting a retaliation claim first must establish a prima facie case by showing "(1) [that she engaged in] protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action."

Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 193 (3d Cir. 2015) (alteration in original) (quoting Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007)).  "If the plaintiff makes these showings, the burden of production of evidence shifts to the employer to present a legitimate, non-retaliatory reason for having taken the adverse action." Id. (citing Mara, 497 F.3d at 300).  "If the employer advances such a reason, the burden shifts back to the plaintiff to demonstrate that 'the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" Id. (quoting Marra, 497 F.3d at 300).

"For purposes of the first prong of a prima facie case of retaliation, protected 'opposition' activity includes not only an employee's filing of formal charges of discrimination against an employer but also 'informal protests of discriminatory employment practices, including making complaints to management.'" Id. (quoting Curay–Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006)) (additional citation omitted).  "Furthermore, although a plaintiff in a retaliation case 'need not prove the merits of the underlying discrimination complaint,' she must have 'act[ed] under a good faith, reasonable belief that a violation existed.'" Id. (alteration in original) (quoting Moore v. City of Philadelphia, 461 F.3d 331, 344 (3d Cir. 2006)).  "This standard requires an 'objectively reasonable belief' that the activity the plaintiff opposed constituted unlawful discrimination under the relevant statute." Id. at 193-94 (quoting Wilkerson v. New Media Tech. Charter Sch. Inc., 522 F.3d 315, 322 (3d Cir. 2008)).

1. Title VII and the ADA

GTC argues that Stocker cannot establish a prima facie case of retaliation in violation of Title VII or the ADA (Count III) because there is no evidence that he made a complaint regarding

discrimination based on a protected category.[6]  Plaintiffs contend that Landes retaliated against Stocker by escalating his harassment after Stocker complained about Landes to Holmes and Holmes informed Landes about those complaints.  Holmes testified that Stocker complained to him that Landes took away his toolbox and that Landes caused him anxiety, which affected his blood pressure, but there is no record evidence that Stocker told Holmes that he believed that Landes took these actions because of his race or disability.  (Holmes Dep. at 50, 56, 60.)  Plaintiffs also assert that Landes retaliated against Stocker for complaining about him to Angela Debro once on May 31, 2016 and again in early December 2016.  Stocker testified at his deposition that he complained to Debro that Landes approached his personal space and also harassed him about his break time and about shaving at his machine.  (Stocker Dep. at 53-55.)  Stocker further stated at his deposition that he told GTC's HR that Landes treated him in this manner because of his race and disability.  (Id. at 55, 58, 60-61.)

GTC asserts that Stocker's unsupported deposition testimony that he complained that Landes discriminated against him based on his race and disability is insufficient to defeat summary judgment because it is contradicted by record evidence.  The Third Circuit has instructed that a "[plaintiff's] unsupported deposition testimony, which is contradicted by the record, is insufficient to defeat summary judgment."  Thomas v. Delaware State Univ., 626 F. App'x 384, 389 n.6 (3d Cir. 2015) (citing N.L.R.B. v. FES, (a Div. of Thermo Power), 301 F.3d 83, 95 (3d Cir. 2002) (additional citations omitted)); see also Byrne v. Monmouth Cty. Dep't of Health Care Facilities, 372 F. App'x 232, 234 (3d Cir. 2010) ("An opponent of summary judgment cannot rely upon

---

[6] We need not address GTC's other arguments that it is entitled to summary judgment as to Count III because we grant the Motion for Summary Judgment as to Count III in connection with this argument.

unsupported assertions, conclusory allegations, or mere suspicions to create a disputed issue."

(citing Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989); Lujan v. Nat'l

Wildlife Fed., 497 U.S. 871, 888 (1990))).

There is record evidence that Stocker did not complain to Debro or anyone at GTC's HR

that he had been discriminated against because of his race and/or disability.   The EEOC

investigator noted in his Charge Detail Inquiry that Stocker told him that he made one complaint

to HR but did not complain about treatment due to race, age, or disability.   (Cabrera Decl. Ex. A

at 3 of 4.)  In addition, Debro states in her Declaration that Stocker never complained to her about

mistreatment based on his race or disability.   (Debro Decl. ¶ 40.)  We conclude that Stocker's

unsupported assertions during his deposition that he made a complaint to GTC's HR that Landes

mistreated him because of his race and disability are insufficient, in and of themselves, to defeat

GTC's Motion for Summary Judgment as to his claims of retaliation in violation of Title VII and

the ADA because they are contradicted by other record evidence.   Accordingly, we grant the

Motion for Summary Judgment as to Stocker's claims of retaliation in violation of Title VII and

the ADA in Count III of the Complaint.

### 2.   The FMLA

GTC argues that it is entitled to summary judgment as to Stocker's claim that he was

retaliated against for using FMLA leave (Count IV) because Stocker cannot establish a causal link

between his protected activity (use of FMLA leave) and any adverse employment action.   To

succeed on an FMLA retaliation claim, the plaintiff must prove the following three factors:  "(1)

[he] invoked h[is] right to FMLA-qualifying leave, (2) [he] suffered an adverse employment

decision, and (3) the adverse action was causally related to h[is] invocation of rights."  Lichtenstein

v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 302 (3d Cir. 2012) (citing Erdman v. Nationwide

Ins. Co., 582 F.3d 500, 508-09 (3d Cir. 2009).  Once the plaintiff has established a prima facie case of retaliation, "the burden shifts to the defendant to provide evidence of a legitimate non-discriminatory reason for the adverse action.  Budhun v. Reading Hosp. & Med. Ctr., 765 F.3d 245, 256 (3d Cir. 2014) (citing McDonnell Douglas, 411 U.S. at 802).  "If the employer meets this 'minimal burden,' the employee must then point to some evidence that the defendant's reasons for the adverse action are pretextual."  Id. (citing Lichtenstein, 691 F.3d at 302).

There is record evidence that Stocker went out on FMLA leave from June 1, 2016 until October 31, 2016.  (SF ¶ 42.)  He applied for short-term disability benefits through GTC's disability insurance carrier, Liberty Mutual, for stress related issues, specifically high blood pressure, anxiety, depression, medical problems and headache.  (Stocker Dep. at 68-69.)  Liberty Mutual approved his application for short-term disability benefits.  (Id. at 73, 78-80.)  Plaintiffs maintain that Stocker suffered an adverse employment action in the form of discipline the day he returned from FMLA leave.  Specifically, he was issued a "Level One" discipline for being inside of a yellow-lined safe work area on October 31, 2016 "without the required safety glasses and safety shoes" even though the location of the safety equipment had been moved while he was on leave.  (SF ¶ 33, Holmes Dep. at 43-44.)  When the Level One discipline for this incident was combined with the Level One discipline issued on April 7, 2016, it became a "Level Two violation and a one-day suspension."  (SF ¶ 33.)  This discipline contributed to GTC's stated reason for Stocker's termination the following March.  (Id. ¶ 38.)  Plaintiffs argue that the temporal proximity between the October 31, 2016 discipline and Stocker's FMLA leave supports the causal connection between the discipline and the FMLA leave.[7]

---

[7] Plaintiffs also suggest that causation can be inferred from the fact that Landes tried to assign Stocker attendance points for every day he was on FMLA leave.  Plaintiffs have submitted

"When the 'temporal proximity' between the protected activity and adverse action is 'unduly suggestive,' this 'is sufficient standing alone to create an inference of causality and defeat summary judgment.'"  Lichtenstein, 691 F.3d at 307 (quoting LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007)).  We conclude that the temporal proximity between Stocker's return from FMLA leave and his discipline (which occurred on the same day), is sufficient at the prima facie stage to indicate that the adverse action was causally related to Stocker's use of FMLA leave.  See id. ("'Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity,' the temporal proximity in this case [one week] is in the realm of what this Court and others have found sufficient at the prima facie stage." (quoting LeBoon, 503 F.3d at 233) (citing Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989); Seeger v. Cincinnati Bell Tel. Co., 681 F.3d 274, 283 (6th Cir. 2012); Wierman v. Casey's Gen. Stores, 638 F.3d 984, 994 (8th Cir. 2011); McCann v. Tillman, 526 F.3d 1370, 1376 (11th Cir. 2008))).  We conclude, accordingly, that Plaintiffs have pointed to record evidence that demonstrates a genuine issue of material fact regarding whether GTC retaliated against Stocker for taking FMLA leave.[8]

---

a Termination Notice prepared for Stocker dated November 1, 2016 (the day after Stocker returned from his FMLA leave), which shows that Stocker was assigned points for unexcused absence while he was on FMLA leave every day from July 11, 2016 through October 28, 2016 and that Landes signed the Termination Notice.  (Pls.' Ex. Attendance Log (Docket No. 35-3).)

[8] GTC also argues that it is entitled to summary judgment as to Stocker's FMLA retaliation claim because Plaintiffs cannot show that GTC's articulated reason for Stocker's termination is pretextual.  GTC relies on the same evidence it relied on with respect to its argument that Stocker could not establish that its articulated reason for his termination was pretextual in connection with Count I.  As we concluded, with respect to Count I, that Plaintiffs have pointed to record evidence "from which a factfinder could reasonably . . . disbelieve [GTC's] articulated legitimate reasons" for Stocker's termination, we deny GTC's Motion for Summary Judgment with respect to this argument in connection with Count IV.  See Fuentes, 32 F.3d at 764.

We therefore deny the Motion for Summary Judgement as to Stocker's claim for retaliation in violation of the FMLA (Count IV).

      F.    <u>Loss of Consortium</u>

GTC argues that it is entitled to summary judgment as to Mrs. Stocker's loss of consortium claim in Count VI because a loss of consortium claim cannot be based on a spouse's Title VII or civil rights claim. "Under Pennsylvania law, loss of consortium claims derive from the injured spouse's right to recover in tort law." <u>Dean v. Philadelphia Gas Works</u>, Civ. A. No. 19-4266, 2019 WL 6828607, at *5 (E.D. Pa. Dec. 12, 2019) (citing <u>Little v. Jarvis</u>, 280 A.2d 617, 620 (Pa. Super. Ct. 1971)). "There is no right to recover for loss of consortium, however, based on civil rights claims under Title VII, the PHRA or § 1983." <u>Id.</u> (citing <u>Goldberg v. City of Philadelphia</u>, Civ. A. No. 91-7575, 1994 WL 313030, at *13 (E.D. Pa. June 29, 1994); <u>McInerney v. Moyer Lumber & Hardware, Inc.</u>, 244 F. Supp. 2d 393, 402 (E.D. Pa. 2002); <u>Williams v. City of Chester</u>, Civ. A. No. 14-4420, 2015 WL 224384, at *4 (E.D. Pa. Jan. 15, 2015)). <u>See also Yarnall v. Philadelphia Sch. Dist.</u>, Civ. A. No. 11-3130, 2013 WL 1389757, at *6 (E.D. Pa. Apr. 4, 2013) (dismissing plaintiff's derivative loss of consortium claims where the spouse's state law tort claims had been dismissed and the spouse's civil rights claims did not support loss of consortium claims) (citing <u>Quitmeyer v. Se. Pa. Transp. Auth.</u>, 740 F. Supp. 363, 370 (E.D. Pa. 1990); and <u>Darr Constr. Co. v. Workmen's Compensation App. Bd.</u>, 715 A.2d 1075, 1080 (Pa. 1998))); <u>Verde v. City of Philadelphia</u>, 862 F. Supp. 1329, 1337 n.5 (E.D. Pa. 1994) ("The loss of consortium count is deemed to be derivative only of the claim for intentional infliction of emotional distress. None of the statutes on which the other counts are based—Title VII, the PHRA, and section 1983—allow other than a personal right of action." (citations omitted)). Loss of consortium claims are also unavailable where the spouse's claims arise under the ADA. <u>See Adam C. v. Scranton Sch. Dist.</u>,

Civ. A. No. 07-532, 2011 WL 996171, at *9 (M.D. Pa. Mar. 17, 2011) (stating that "[l]oss of consortium claims are not available . . . under the ADA and RA" (citing Vargus v. Matthew Donut, Inc., Civ. A. No. 92-301, 1994 WL 259802 (D.N.H. 1994))).  A spouse's FMLA claims also cannot support loss of consortium claims.  See Brown v. ATX Grp., Inc., Civ. A. No. 11-3340, 2012 WL 3962620, at *11 (N.D. Tex. July 16, 2012) ("[S]everal courts have held that a claim for loss of consortium is not available under the FMLA, ADA, or § 1983." (citing Jean–Louis v. Clifford, Civ. A. No. 06-3972, 2012 WL 274031, at *8 (D.N.J. Jan. 31, 2012); Laute v. City of Gloucester, Civ. A. No. 11-3792, 2012 WL 253132, at *4 (D.N.J. Jan.25, 2012); Cookenmaster v. Kmart Corp., Civ. A. No. 07-13947, 2008 WL 4539385, at * 19 (E.D. Mich. Oct.7, 2008))).  Stocker has asserted claims against GTC for violations of Title VII, the ADA, the PHRA, and the FMLA. Since loss of consortium claims are not available when the spouse's claims are based on Title VII, the ADA, the PHRA or the FMLA, we grant GTC's Motion for Summary Judgment with respect to Mrs. Stocker's claim for loss of consortium.

## IV.    CONCLUSION

For the reasons stated above, we grant GTC's Motion for Summary Judgment as to Stocker's claim of race discrimination in violation of Title VII in Count I with respect to all adverse employment actions except for the termination of Stocker's employment; Stocker's claim of discrimination in violation of the ADA in Count II; Stocker's claim of retaliation in violation of Title VII and the ADA in Count III; and his claims of discrimination and retaliation in violation of

the PHRA in Count V.  We also grant the Motion with respect to Mrs. Stocker's loss of consortium

claim in Count VI.  The Motion is denied in all other respects.  An appropriate order follows.


BY THE COURT:


/s/ John R. Padova
_____
John R. Padova, J.